UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

LAWRENCE PELLETIER            :
                             :
        v.                   :   Civ. No.  3:99cv1559 (HBF)
                             :
JOHN ARMSTRONG, CLYDE MCDONALD,:
MARY MARTO, CHERYL MALCOLM,   :
THERESA LANTZ, PAMELA L.      :
RICHARDS, HECTOR RODRIGUEZ,   :
MARK STRANGE, and JOHN TARASCIO:


**RULING ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I.   Introduction

     Plaintiff, Lawrence Pelletier, is a Connecticut inmate
currently incarcerated at the MacDougall Correctional
Institution.  Plaintiff, who was diagnosed with chronic Hepatitis
C ("HCV") and Hemochromatosis, brings this action pursuant to 42
U.S.C. § 1983, alleging violations of his rights under the Eighth
and Fourteenth Amendments.  In essence, plaintiff alleges that
the defendants, who are sued in both their individual and
official capacities, were deliberately indifferent to his serious
medical needs by failing to treat his chronic HCV from 1993 until
the time he commenced this action in 1999.  Plf's. Memo. p. 1.
Plaintiff also alleges that defendants retaliated against him in
violation of the First Amendment, by transferring him to a
Virginia Correctional Facility after he filed this lawsuit.
Pl's. Memo. p. 2.[1]

_____

     [1] Plaintiff's *pro se* third amended complaint also asserts
claims for injunctive relief under Conn. Gen. Stat. § 19a-103 and
42 U.S.C. § 1983.  In response to defendants' motion for summary

The following individuals were named as defendants: 1) John Armstrong and Theresa Lantz, former/present Commissioners of the Connecticut Department of Corrections; 2) John Tarascio, Mark Strange, Pam Richards, and Hector Rodriguez, present/former Wardens of the Connecticut Department of Corrections; 3) Cheryl Malcolm and Mary Marto, nurses; and 4) Clyde McDonald, a Health Services supervisor who holds the title of Director of Field Services. Defendants move for summary judgment on several grounds: 1) that the plaintiff fails to allege the requisite personal involvement of the defendants; 2) that the defendants did not treat plaintiff with deliberate indifference; 3) that the defendants are entitled to qualified immunity; and 4) that there is no basis for a retaliation claim.[2]

For the reasons stated below, defendants' motion for summary judgment [Doc. # 94] is **granted.**

II. Facts

Plaintiff, currently 63 years old, has been in the custody of the Connecticut Department of Corrections ("DOC") since 1979.

_____

judgment, the plaintiff states that the deliberate indifference and the retaliation claims are the only basis for which he now seeks monetary relief. Pl's. Memo. pp. 1, 9. Plaintiff concedes that the two statutory claims for injunctive relief are no longer viable and are not being pursued. Id. Therefore, the Court finds that these claims for injunctive relief are withdrawn.

[2] Defendants also argue that Conn. Gen. Stat. § 19a-103 is not cognizable under 42 U.S.C. § 1983, was not violated by defendants, and does not allow a civil action for money damages. As these claims have been withdrawn by plaintiff, the Court will not consider the merits of this defense.

[Pl.'s Third Amended Complaint ("Pl.'s Compl.")(Doc. # 58) ¶ 15].
Throughout his incarceration, plaintiff has been housed at
various institutions including the MacDougall Correctional
Institution, the Corrigan Correctional Institution, the Cheshire
Correctional Institution, the Somers Correctional Institution,
and Wallens Ridge State Prison in Virginia.  Defs'. Summary of
Medical Records.

Frederick Altice, M.D., is a physician who has been licensed
in the State of Connecticut since 1986.  Defs'. Local Rule 56(a)1
Statement ¶ 1 ["Defs'. Stat."]; Altice Aff. ¶¶ 1-2.  Dr. Altice
is Board Certified in Internal Medicine and Infectious Diseases.
Defs'. Stat. ¶ 2; Altice Aff. ¶ 3.  He is presently employed as
an Attending Physician in the AIDS Care Program and Infectious
Disease Section at Yale New Haven Hospital.  Defs'. Stat. ¶ 2;
Altice Aff. ¶ 4.  He is also the Director of Clinical Research
and the HIV in Prisons Program at Yale University School of
Medicine.  Id.

From 1992 to January of 1998, Dr. Altice provided infectious
disease consultation services to prisoners housed at the DOC.
Defs'. Stat. ¶ 3.  Since July of 1999, Dr. Altice has also
provided infectious disease consultation services to the
University of Connecticut Health Center, Correctional Managed
Health Care ("CMHC").  Altice Aff. ¶ 5.  This program provides
health care to Connecticut inmates.  In December of 2002, CMHC
issued a comprehensive Hepatitis C Management and Treatment
Policy which includes a Hepatitis C Review Board ("Hep CURB") to

review inmate requests for treatment of HCV. Defs'. Stat. ¶ 4; Altice Aff. ¶ 6. Drs. Edward Blanchette, John Gittzus, and Frederick Altice, all licensed physicians certified in infectious diseases, serve on the Hep CURB. Defs'. Stat. ¶ 5. They have served on the Hep CURB since its creation in December 2002. Id.

In October 1998, CMHC established guidelines for HCV treatment. Defs'. Stat. ¶ 6. The guidelines adopted criteria established by the National Institute of Health ("NIH") for HCV therapy. Id. The 1998 CMHC guidelines required periodic liver function studies to establish transaminase ("ALT") values. If the ALT levels remained above 100 on at least two occasions measured four to six months apart, the inmate would be referred to the CMHC Utilization Review Committee for approval of further evaluations and tests.[3] Id. These tests would determine if the inmate was a candidate for HCV drug therapy. Id.

On April 6, 1993, DOC medical staff performed a blood test on plaintiff. Pl's. Compl. ¶ 16; Pl's. Ex. D, 0040. The results of this blood test revealed high levels of iron and an ALT level of 133. Id. On February 24, 1994, another blood test was performed on plaintiff. The results of this blood test revealed an elevated ALT level of 118. Pl's. Ex. D, 0044. On March 7, 1994, Dr. Blanchette reported that he "suspect[ed] [plaintiff had] chronic HCV." Id. at 0047.

---

[3] In 2000, the Guidelines were modified to require referral of inmates whose ALT levels exceed 80 on two occasions measured at least four to six months apart.

4

Subsequently, plaintiff's ALT levels decreased significantly -- ALT level of 70 on April 7, 1995; ALT level of 52 on November 1, 1996; and an ALT level of 42 on July 31, 1998.  Pl's. Ex. D 0048; 0052.  Plaintiff's ALT levels began to rise again in 1999 - ALT level of 94 on March 26, 1999; ALT level of 85 on November 30, 1999; and ALT level of 98 on August 10, 2000.  Pl's. Ex. D 0056, 0060, 0065.

On May 2, 2001, a liver biopsy was performed on plaintiff. Defs'. Summary of Medical Records.  Due to the high level of iron found in plaintiff's liver, plaintiff was sent to George Wu, M.D., Ph.D., a Gastroenterologist with the Department of Gastroenterology at CMHC.  Defs'. Stat. ¶ 7; Defs'. Summary of Medical Records.  In a report dated June 26, 2001, Dr. Wu noted that plaintiff had "active hepatitis with a moderate degree of severity."  Id.  Dr. Wu also found plaintiff had "hepatocellar iron accumulation raising the question of Hemochromatosis."  Id. Although noting that plaintiff was asymptomatic and claimed he felt well, Dr. Wu recommended that plaintiff's course of treatment include testing for "HFE mutations and primary for C282Y mutation."  Id.  Dr. Wu noted that these testings were not available for one to two months.  Id.  If plaintiff was diagnosed with Hemochromatosis, Dr. Wu recommended treating this condition with a phlebotomy regimen before conducting HCV treatment.  Id.

The follow-up testing for Hemochromatosis was requested on July 30, 2001.  However, the testing did not actually take place until October 23, 2001.  Defs'. Summary of Medical Records.

Plaintiff tested positive for Hemochromatosis, and his Ferritin level was 339.  Id.  From November 19, 2001 through July 9, 2002, plaintiff was treated for Hemochromatosis by undergoing eleven phlebotomies.  Defs'. Summary of Medical Records.

By July of 2003, plaintiff had successfully completed treatment for the Hemochromatosis, his Ferritin level had dropped to 20-25, and he had undergone Hep C genetic testing.  Id.  On July 9, 2003, the Hep CURB approved HCV therapy for plaintiff. Defs'. Summary of Medical Records; Altice Aff. ¶ 12.  Plaintiff was treated with pegylated interferon and ribavarin from October 13, 2003 through March 27, 2004.  Altice Aff. ¶ 13.  In accordance with the HCV protocol established in the 2002 DOC policy, patient follow-up was conducted for a period of six months.  PCMHC Policy No. G. 2.11, ¶ 7; Altice Aff. ¶ 14.

Unfortunately, plaintiff did not respond successfully to this HCV therapy.  Id.  From April of 2004 to May of 2005, plaintiff's ALT's levels ranged from a low of 28 to a high of 78. Dr. Altice states that plaintiff's current ALT levels are "generally stable and in the moderate range."  Altice Aff. ¶ 15. Dr. Altice also states that, to a reasonable degree of medical certainty, the care and treatment afforded plaintiff for his HCV was within the acceptable standards of care.  Altice Aff. ¶ 16. Both Dr. Blanchette and Dr. Altice conclude that it would have been "clinically inappropriate to have begun Hep C treatment prior to ruling out Hemochromatosis."  Id.; Blanchette Aff. ¶ 9. In fact, Dr. Altice states that the treatment received by

plaintiff is the same course of treatment he would have recommended if plaintiff had been seen by him at Yale University. Altice Aff. ¶ 11.

Plaintiff alleges that he complained to medical staff about his HCV condition and repeatedly requested treatment from 1993 to 1999. Pl's. Compl. at ¶ 24. First, plaintiff alleges that on March 15, 1994, he requested treatment for his liver condition while incarcerated at the MacDougall Correctional Institution. Pl.'s Compl. at ¶ 24(a). Plaintiff does not offer any documents or sworn statements evidencing his March 1994 request. Additionally, the medical records submitted by plaintiff do not indicate that he requested treatment from 1993 through 1997. Pl's Ex. D. at 0050 - 0053. In fact, the first time the medical records document plaintiff's request for treatment is on July 30, 1998. Id. at 0054. Second, plaintiff alleges he was transferred to the Cheshire Correctional Institution in 1997 and informed Dr. Malch,[4] Chief Medical Doctor, about his diagnoses. Pl's. Compl. at ¶ 24(b). Third, plaintiff alleges he served a "Notice and Formal Demand" on defendants Lantz, Armstrong, McDonald, Marto, Malcolm, and other undesignated medical staff, on July 1, 1999. This letter outlined the alleged lack of diagnostic testing and inadequate treatment plaintiff claimed to be receiving. Pl's. Compl. at ¶¶ 24 (e) - (j); Pl's. Ex. D at 002 - 003. In this letter, plaintiff requested "proper testing and treatment in a

---

[4] Dr. Malch is not a named defendant in this lawsuit.

7

reasonable amount of time."  Id.

Under Conn. Gen. Stat. § 18-86(b), the Connecticut Legislature authorized the Commissioner of Corrections, "'to improve the operation of the state's correctional facilities' by entering into a contract with any other governmental or private vendor to send 500 inmates outside of the state of Connecticut." Defs'. Stat. ¶ 39.  As a result of this contract, Virginia became the governmental vendor for Connecticut inmates for the term October 22, 1999 through October 21, 2000.  Id.  Due to the overcrowding issues at the Connecticut DOC facilities, the DOC immediately began to transfer Connecticut inmates under the contract.  Defs.' Memo. pp. 29-30.  On November 9, 1999, plaintiff was transferred to the Wallens Ridge State Prison in the Commonwealth of Virginia.  Defs'. Stat. ¶ 35.

Plaintiff claims he was transferred in retaliation for filing this lawsuit.  Plaintiff also states that under the contract, only inmates with "[n]o serious medical problems" could be transferred.  Pl's. Ex. E.  Defendants claim that, although plaintiff was transferred after he filed this lawsuit, the complaint was not delivered to the United States Marshal for service until December 13, 1999 and was not served on defendants until December 23, 1999.  Defs'. Reply Memo. at p. 7.  Defendants state that they were not aware of plaintiff's lawsuit until the complaint was served.  Id.  Thus, as plaintiff was transferred more than a month before the complaint was served, defendants state they were not aware of the lawsuit when the decision to

transfer was made or when the actual transfer occurred.  Instead, defendants claim plaintiff was chosen for transfer under this contract because he was a maximum security inmate with a long sentence, and he met all applicable criteria.  Defs'. Stat. ¶ 34.

In accordance with the contract, plaintiff was returned to Connecticut on November 3, 2000, approximately one year later.  Defs'. Stat. ¶ 39.  Plaintiff was seen by medical staff at Wallens Ridge State Prison on twenty-nine occasions.  Defs'. Stat. ¶ 36.

III. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Rule 56(c), Fed. R. Civ. P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Commc'ns Inc. v. Herrick Co., Inc., 360 F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing -- that is pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" <u>Miner v. Glen Falls</u>, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir.) (quoting <u>Anderson</u>, 477 U.S. at 248), <u>cert. denied</u>, 506 U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact."  <u>Soto v. Meachum</u>, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991).  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted).  A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements.  <u>See Securities & Exchange Comm'n v. Research Automation Corp.</u>, 585 F.2d 31, 33 (2d Cir. 1978).  Nor may he rest on the "mere

allegations or denials" contained in his pleadings. <u>Goenaga v.</u>
<u>March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir.
1995).

The court resolves "all ambiguities and draw[s] all
inferences in favor of the nonmoving party in order to determine
how a reasonable jury would decide." <u>Aldrich</u>, 963 F.2d at 523.
Thus, "[o]nly when reasonable minds could not differ as to the
import of the evidence is summary judgment proper." <u>Bryant v.</u>
<u>Maffucci</u>, 923 F.2d 979, 982 (2d Cir.), <u>cert. denied</u>, 502 U.S. 849
(1991). <u>See also Suburban Propane v. Proctor Gas, Inc.</u>, 953 F.2d
780, 788 (2d Cir. 1992). If, "'as to the issue on which summary
judgment is sought, there is any evidence in the record from
which a reasonable inference could be drawn in favor of the
opposing party, summary judgment is improper.'" <u>Security Ins.</u>
<u>Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77,
83 (2d Cir. 2004) (quoting <u>Gummo v. Village of Depew</u>, 75 F.3d 98,
107 (2d Cir. 1996)).

IV.  <u>Discussion</u>

Plaintiff alleges that he was denied medical treatment for
his HCV condition from 1993 through 1999. Pl's. Mem. p. 1.
Specifically, plaintiff claims that defendants, acting in both
their individual and official capacities, were deliberately
indifferent to his serious medical needs, that they delayed HCV
treatment, that they only provided medical treatment after he
filed this complaint, and that they transferred him to a prison

11

in another state in retaliation for filing this lawsuit.  Id.
Plaintiff now seeks money damages, punitive damages, and
attorneys fees.

Defendants move for summary judgment, alleging that the
named defendants were not responsible for treating plaintiff and,
thus, the plaintiff has failed to allege the requisite personal
involvement of the defendants.  Defendants also allege that
plaintiff was not treated with deliberate indifference and was
not subject to a retaliatory transfer.

A.  **Eleventh Amendment Immunity**

In plaintiff's Third Amended Complaint, defendants are sued
in both their individual and official capacities.  Pl.'s Compl.
¶¶ 3-12.

Under the Eleventh Amendment, a suit for money damages may
not be maintained against the state, or any of its agencies or
departments, unless the state has waived sovereign immunity.
Florida Dep't of State v. Treasure Salvors, 458 U.S. 670, 684
(1982).  This Eleventh Amendment immunity is not superseded by 42
U.S.C. § 1983.  Quern v. Jordan, 440 U.S. 332, 342 (1979).  In
addition to protecting states, Eleventh Amendment immunity
protects state officials who are sued in their official
capacities from being liable for money damages.  Kentucky v.
Graham, 473 U.S. 159 (1985).  To hold otherwise would circumvent
Eleventh Amendment immunity because a suit against a defendant in
his official capacity is, in essence, a suit against the state

12

since the money damages would be paid from state funds.
Pennhurst State Sch. & Hosp. v. Halerman, 465 U.S. 89, 101 n. 11
(1984).

Here, plaintiff's claims against the defendants in their
official capacities are barred by the Eleventh Amendment.
Summary judgment shall enter on all claims for damages against
the defendants in their official capacities.

### B.   **Personal Involvement and Section 1983**

It is a well-established principle that "personal
involvement of defendants in alleged constitutional deprivations
is a prerequisite to an award of damages under [section] 1983."
Johnson v. Wright, 234 F. Supp. 2d 352, 362-63 (S.D.N.Y. 2002),
(quoting Wright v. Smith, 21 F.3d 496 (2d Cir.), rev'd. on other
grounds, 412 F.3d 398 (1994)).  A state official cannot be held
liable under § 1983 based on the theory of respondeat superior.
Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Liability
based on a defendant's supervisory status, without more, will not
suffice to impose § 1983 liability.  Ayers v. Coughlin, 780 F.2d
205, 210 (2d Cir. 1985) ("linkage to the prison chain of command"
is insufficient to demonstrate personal involvement).

A defendant has the requisite personal involvement for
section 1983 liability when:

> (1) the defendant participated directly in
> the alleged constitutional violation; (2) the
> defendant, after being informed of the
> violation through a report or appeal, failed
> to remedy the wrong, (3) the defendant
> created a policy or custom under which

13

> unconstitutional practices occurred, or
> allowed the continuance of such policy or
> custom, (4) the defendant was grossly
> negligent in supervising subordinates who
> committed wrongful acts, or (5) the defendant
> exhibited deliberate indifference to the
> rights of inmates by failing to act on
> information indicating that unconstitutional
> acts were occurring.

Johnson, 234 F. Supp. 2d at 363 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  "A suit for deliberate indifference to a serious medical need cannot be maintained against a defendant who has no role in the provision of medical care."  Murphy v. State of Connecticut Dep't. of Public Health, 3:04CV976RNC, 2006 WL 908435, at * 2 (D. Conn. Mar. 30, 2006) (citing Hanton v. Strange, No. 3:98cv706CFD, 2005 WL 733873, at *5 (D. Conn. Mar. 30, 2005)).  Thus, to impose supervisory liability, a prisoner must allege that the official had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act.  Merriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

Here, plaintiff does not claim and has not provided any evidence that these defendants had direct involvement in his treatment or that the DOC enforced unconstitutional customs or policies.  Plaintiff argues that the defendants failed to remedy a known violation.  Pl's. Memo p. 17.

Plaintiff alleges that the defendants were made aware of his civil rights violations on several occasions.  Id.  First, plaintiff alleges defendant Wardens Rodriguez and Strange were on

14

notice of his March 14, 1994, request for treatment to unidentified health care providers.  Id.  Second, plaintiff claims that he requested treatment for his HCV condition while incarcerated at Cheshire Correctional Institution through the submission of an Inmate Request Form dated July 21, 1998.[5] Third, plaintiff relies on his July 1, 1999 Formal Demand for Treatment letter.  Pl's. Compl. ¶¶ 24(a) - (m); Pl's. Local Rule 56(a)2 Statement ¶¶ 7 - 14; 21 - 26 ["Pl's. Stat."]; Pl's. Memo p. 18.  In the formal demand sent to the Corrigan Correctional Institution, plaintiff stated that his ALT levels had been elevated since 1993, and he requested treatment for HCV.  Page two of plaintiff's letter notes that he sent carbon copies of the letter to Armstrong, Lantz, McDonald, Marto, Malcolm, Corrigan Medical Staff, Editor-Journal Inquirer, Editor-New Haven Register, Editor-Hartford Courant, and personal file.  Plaintiff's letter does not list defendants Richards, Rodriguez, Strange, and Tarascio as carbon copy recipients.

The fact that plaintiff alleges to have made one or two formal/informal demands for treatment is insufficient to establish personal involvement by any of these defendants.  Under Section 1983, officials cannot be held personally liable based

_____

    [5]  A copy of the form allegedly submitted by plaintiff, and attached to his opposition to summary judgment, is incomplete and does not identify when and to whom the form was submitted.  Pl's. Ex. D. 0039.  In his complaint, plaintiff states he submitted this form to Dr. Malch.  Dr. Malch is not a named defendant. Additionally, plaintiff does not allege that any of the named defendants worked at Cheshire Correctional Facility and would have been in a position to receive this request.

solely on their supervisory capacity.  Plaintiff must prove the
defendants were aware of the alleged constitutional deprivation
and failed to prevent it or were deliberately indifferent to its
occurrence.  "An allegation that an official ignored a
prisoner's letter of protest and request for an investigation of
allegations made therein is insufficient to hold that official
liable for the alleged violations" and will not satisfy
plaintiff's burden.  Johnson, 234 F. Supp. 2d at 363 (quoting
Greenwaldt v. Coughlin, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19,
1995)) (citing Rivera v. Goord, 119 F. Supp. 2d 327, 344
(S.D.N.Y. 2000)) (ignored letters to prison officials are
insufficient to hold officials liable); Woods v. Goord, 1998 WL
740782, at *6 (S.D.N.Y. Oct. 23, 1998) ("[r]eceiving letters or
complaints ... does not render [prison officials] personally
liable under § 1983").  To hold otherwise, officials would be
personally liable based on status alone.  Walker v. Pataro, 2002
WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[i]f mere receipt of
a letter or similar complaint were enough, without more, to
constitute personal involvement, it would result in liability
merely for being a supervisor, which is contrary to the black-
letter law that § 1983 does not impose *respondeat superior*
liability.").

     In his complaint, plaintiff alleges that he notified several
defendants through various means:  1) defendants Rodriguez and
Strange through medical reports; 2) unknown defendants through an
incomplete inmate form allegedly submitted at Cheshire

Correctional Institution; and 3) Lantz, Armstrong, McDonald, Marto, and Malcolm through a formal demand for treatment by way of letter dated July 1, 1999.  Plaintiff does not state how defendant Tarascio or Richards were made aware of his request for treatment.  In response to summary judgment, plaintiff has not produced any additional evidence that he notified the defendants of his request for medical treatment, that they were aware of his medical needs, that they received these alleged written requests for treatment, that they played any role in plaintiff's diagnosis or treatment decisions, or that he received a response to his demand from any defendant besides Ms. Malcolm.  Applying the above principles, the Court will analyze each named defendant.

**Armstrong/Lantz**.  John J. Armstrong was the Commissioner of Corrections for the State of Connecticut from January of 1995 until March of 2003.  Armstrong Aff. ¶ 2.  Theresa Lantz is the present Commissioner of the Connecticut Department of Corrections.  Defs'. Memo. p. 1.  Neither Mr. Armstrong nor Ms. Lantz had any personal involvement in, or knowledge of, plaintiff's medical treatment.  Plaintiff tries to establish their personal involvement through his July 1, 1999 letter.  Both Mr. Armstrong and Ms. Lantz deny having received plaintiff's demand for treatment, and plaintiff has not produced any evidence that they did, in fact, receive the July 1, 1999 letter. Additionally, plaintiff has not produced any evidence that Mr. Armstrong or Ms. Lantz were aware of plaintiff's medical needs or failed to act based on this knowledge.  As noted above, an

allegation that a supervisor received a letter and failed to act is not sufficient to establish personal liability under Section 1983. Even if Mr. Armstrong or Ms. Lantz were aware of plaintiff's allegations, mere awareness of a constitutional violation is insufficient to impose liability. Plaintiff must establish gross negligence or deliberate indifference, and this he has not done.

**McDonald**. Clyde McDonald is the Field Operations Director at CMHC. McDonald Aff. ¶ 4. Some of his duties include providing administrative oversight and directing the medical, mental health, pharmacy, dental, and ancillary services for all DOC facilities. Id. at 5. Mr. McDonald alleges that he had no personal contact with plaintiff and was not involved with his care or treatment. Id. at 6. Plaintiff claims that a carbon copy of the July 1, 1999, letter was sent to Mr. McDonald. In support of summary judgment, Mr. McDonald also denies having received correspondence from plaintiff in 1999. In response to Mr. McDonald's affidavit, plaintiff simply refers to the allegations made in his complaint and offers no further evidence that Mr. McDonald was aware of plaintiff's medical needs and deliberately ignored them. Plaintiff cannot defeat the motion through this type of "mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).

**Marto**. Mary Marto has been licensed as a Registered Nurse by the State of Connecticut since 1982. Marto Aff. ¶ 2. Since

1997, Ms. Marto has been a Health Services Administrator for the University of Connecticut Health Center. _Id._ at ¶ 4. Ms. Marto did not provide direct medical care to inmates. _Id._ at ¶ 5. Ms. Marto claims that she did not have personal contact with the plaintiff and did not make any decisions with respect to his treatment. _Id._ Plaintiff tries to establish Ms. Marto's personal involvement through his July 1, 1999, letter. However, there is no evidence that Ms. Marto received this letter, was aware of plaintiff's medical needs, or failed to act based on this knowledge. Besides the conclusory allegations made in his complaint, plaintiff does not offer any additional evidence that Ms. Marto knew of plaintiff's request for treatment or that she had any involvement in his medical care. Without evidence of personal involvement, plaintiff must establish gross negligence or deliberate indifference, and this he has not done.

**Malcolm**. Cheryl Malcolm has been licensed as a Registered Nurse by the State of Connecticut since 1974. Malcolm Aff. ¶ 3. On July 13, 1999, Ms. Malcolm did respond to plaintiff's request for treatment by suggesting he utilize the sick call request system at Corrigan Correctional Institution. Defs'. Summary of Med. Records. Ms. Malcolm also told plaintiff to refer all questions/concerns to the facility health care professionals who are the primary care providers. Defs'. Summary of Med. Records. Although Ms. Malcolm clearly received plaintiff's formal demand for treatment, mere awareness that a request existed is insufficient to impose personal liability. Plaintiff must

19

establish gross negligence or deliberate indifference.  Ms.
Malcolm was not indifferent or grossly negligent.  She responded
to plaintiff's request by informing him how to request treatment.
Plaintiff has not offered any evidence that Ms. Malcolm had any
personal involvement or control over any decisions made regarding
plaintiff's medical treatment.  "A suit for deliberate
indifference to a serious medical need cannot be maintained
against a defendant who has no role in the provision of medical
care."  Hanton v. Strange, No. 3:98CV706CFD, 2005 WL 733873, at
*5 (D. Conn. Mar. 30, 2005).

**Strange**, **Tarascio**, **Richards**, **Rodriguez**.  John Tarascio, Mark
Strange, Pam Richards and Hector Rodriguez are all present/former
Wardens of the Connecticut Department of Corrections.  Plaintiff
alleges that these defendants were aware of his request for
medical treatment as a result of his medical records and his July
1, 1999, letter.  However, the July 1, 1999, letter was not
addressed or carbon copied to any of these defendants.  There is
no evidence that these defendants reviewed or had access to
plaintiff's medical records.  Additionally, the first notation in
the medical records which indicates that plaintiff requested
treatment is on July 30, 1998.  Pl's. Ex. D at 0054.  Plaintiff
does not allege that any of these defendants replied to his July
1, 1999 Formal Demand or took any other action with regards to
his medical treatment.  "An allegation that a prison official
received correspondence and did not act on it does not state a
claim for personal involvement under section 1983."  Johnson, 234

F. Supp. 2d at 364.  Without more, plaintiff must establish gross negligence or deliberate indifference.  Once again, plaintiff cannot maintain a suit for deliberate indifference to a serious medical need against a defendant who had no role in the provision of medical care.  Murphy v. State of Connecticut, Dept. of Public Health, No. 3:04CV976RNC, 2006 WL 908435, at *2 (D. Conn. Mar. 30, 2006).

### C.   **Deliberate Indifference**

Even if the Court were to find that the defendants were aware of the alleged unconstitutional conduct and could be held personally liable, plaintiff has failed to allege any facts which a reasonable juror could infer that they were deliberately indifferent to plaintiff's medical needs.

Deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, not every lapse in medical care rises to the level of a constitutional violation.  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006).  To prevail on a deliberate indifference claim, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  Plaintiff must show intent to either deny or unreasonably delay access to needed medical care or the wanton

infliction of unnecessary pain by prison personnel.  Id. at 104-05.

Mere negligence will not support a section 1983 claim, "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," id.; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act."  McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)); see also Estelle, 429 U.S. at 106 ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.");  Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (holding that treating physician is liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind.").

Additionally, inmates do not have a constitutional right to the treatment of their choice.  See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992).

Thus, "a prison official violates the Eighth Amendment only when two requirements are met."  Salahuddin, 2006 WL 3041934, at

*10 (quoting <u>Farmer</u>, 511 U.S. at 834). These two requirements
are comprised of both a subjective and an objective standard.
See <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994), <u>cert.
denied sub nom.</u> <u>Foote v. Hathaway</u>, 513 U.S. 1154 (1995).

Under the objective component, the alleged deprivation must
be "sufficiently serious" in objective terms. <u>Wilson v. Seiter</u>,
501 U.S. 294, 298 (1991). The Second Circuit has identified
several factors that are highly relevant to the inquiry into the
seriousness of a medical condition: "'[t]he existence of an
injury that a reasonable doctor or patient would find important
and worthy of comment or treatment; the presence of a medical
condition that significantly affects an individual's daily
activities; or the existence of chronic and substantial pain.'"
<u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d. Cir. 1998) (citation
omitted). In addition, where the denial of treatment causes
plaintiff to suffer a permanent loss or life-long handicap, the
medical need is considered serious. See <u>Harrison v. Barkley</u>, 219
F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to
satisfy the objective component of the deliberate indifference
standard, plaintiff also must present evidence that,
subjectively, the charged prison official acted with "a
sufficiently culpable state of mind." <u>Hathaway</u>, 37 F.3d at 66.
"[A] prison official does not act in a deliberately indifferent
manner unless that official 'knows and disregards an excessive
risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837). However, '[t]he reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result . . . proof of awareness of a substantial risk of harm suffices." Salahuddin, 2006 WL 3041934, at *11 (citing Farmer, 511 U.S. at 835).

The judgment of prison doctors is presumed valid unless the prisoner provides evidence that the decision was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990). In White, the prison doctor deliberately refused to tell White, who was severely allergic to penicillin, whether the medication he had prescribed contained penicillin. The court found that there was no ready justification for this decision and concluded that the doctor's refusal was "so far outside the realm of professional judgment as to demonstrate the [doctor] was not exercising professional judgment at all." Id. at 114. In addition, the doctor repeated a previously failed treatment. The court noted that if the sole purpose for repeating the treatment was to cause pain, the treatment would state a claim under the Eighth Amendment. If, however, the doctor thought the treatment would be beneficial and, later, was shown to be incorrect, the doctor's

actions would constitute only medical malpractice.  See id. at
110-11.

     Plaintiff first alleges that defendants concede the
"objective requirement of the Eighth Amendment's two-part test."
Pl's. Obj. p. 11.  Specifically, plaintiff argues that defendants
have failed to produce any evidence disputing the fact that
plaintiff was deprived of medical treatment of his HCV condition
between 1993 and 1999 or that his HCV condition was sufficiently
serious.  Id.  Therefore, plaintiff concludes that defendants
acquiesce to the first prong.  The Court finds that plaintiff's
interpretation of defendants' argument is mistaken.

     Chronic HCV is a serious medical condition.  See, e.g.,
Christy v. Robinson, 216 F. Supp. 2d 398, 413 (D.N.J. 2002)
(holding that chronic Hepatitis C is a serious medical need).
The issue of a serious medical need, however, is fact-specific;
it "must be tailored to the specific circumstances of each case."
Smith, 316 F.3d at 185.  See Bender v. Regier, 385 F.3d 1133,
1137 (8th Cir. 2004) (agreeing with district court's
determination that although Hepatitis C infection was a serious
medical need, the issue was whether inmate had serious medical
need for immediate interferon treatment).  The serious medical
need at issue in this case, therefore, is not whether plaintiff
suffered from a serious medical condition, but whether plaintiff
had a serious medical need for treatment between 1993 and 1999.

     Defendants assert that, under the October 1998 NIH
guidelines, an inmate would be referred to the CMHC Utilization

25

Review Committee for approval of further evaluations and tests if his ALT levels remained above 100 on two occasions measured at least four to six months apart. Defs'. Stat. ¶ 20. The medical evidence submitted by both plaintiff and defendants demonstrates plaintiff's ALT levels as follows:

| | | |
|---|---|---|
| April 6, 1993 | - | ALT 133 |
| February 24, 1994 | - | ALT 118 |
| April 7, 1995 | - | ALT 70 |
| November 1, 1996 | - | ALT 42 |
| March 26, 1999 | - | ALT 94 |
| November 30, 1999 | - | ALT 85 |

Pl's. Ex. D, 0040 - 0060. Although plaintiff's ALT levels were above 100 in 1993 and 1994, his ALT level decreased by 15 from 1993 to 1994. Subsequent tests performed from 1995 through 1999 evidence a significant decrease in plaintiff's ALT levels. From 1995 through 1999, plaintiff never reached an ALT level of 100. Thus, there is no evidence that plaintiff met the criteria for HCV treatment from 1993 through 1999. Defs'. Memo p. 15; Blanchette Aff. ¶ 7; Defs'. Stat. ¶ 21. In fact, plaintiff admits that he "did not qualify for HCV treatment under the applicable guidelines." Pl's. Memo. p. 1. The Court finds that plaintiff was not eligible for treatment from 1993 through 1999.

In 2001, when plaintiff's ALT's level began to rise significantly, plaintiff was referred to Dr. Wu for a liver biopsy. This liver biopsy revealed Grade IV fibrosis and hepatocellar iron. Defs'. Stat. ¶ 7. These elevated Ferritin

levels raised the question of Hemochromatosis. Dr. Wu determined
that plaintiff should be treated for the Hemochromatosis before
being considered for HCV treatment. Id. Once plaintiff's
Hemochromatosis treatment was completed, plaintiff was approved
for HCV treatment. Blanchette Aff. ¶ 10. HCV treatment began on
October 13, 2003 and was completed on March 27, 2004. Blanchette
Aff. ¶ 11.

The record does not contain any evidence which demonstrates
that plaintiff's treating physicians deviated from the standard
of care in deciding not to treat plaintiff's HCV condition
during the period of 1993 through 2003. The medical records and
affidavits produced establish just the opposite - that the health
care providers utilized sound medical judgment. Although
plaintiff alleges that the failure to treat his HCV has caused
irreparable injury, he has provided no affidavit or other
admissible evidence to support this claim. These conclusory
allegations are insufficient to oppose defendants' motion for
summary judgment.

The court concludes that plaintiff has failed to meet his
burden of providing evidence to show that the medical
professionals were not relying on sound medical judgment in
determining that he was not a candidate for HCV treatment from
1993 to 1999 and while his Hemochromatosis condition remained
untreated. In essence, the only thing plaintiff's claim
constitutes is a disagreement about appropriate treatment. Mere
disagreements with prison officials about what constitutes

appropriate care does not state a claim cognizable under the Eighth Amendment.  <u>Ross</u>, 784 F. Supp. at 44.  Defendants' motion for summary judgment is granted on this ground.

**D.   Retaliatory Transfer**

Plaintiff alleges a cause of action based on retaliation for the exercise of his constitutional right guaranteed under the First Amendment.  Specifically, plaintiff alleges that he was transferred to the Wallens Ridge State Prison in Virginia eighty-eight days after filing this lawsuit.  Pl's. Memo p. 16.  Plaintiff argues that "the temporal proximity of the filing of the Complaint and [his] transfer to Virginia provides more than adequate circumstantial evidence of retaliation."  <u>Id.</u> at p. 15.

Generally, prisoners do not have a constitutional right to placement in a particular institution.  <u>Olim v. Wakinekona</u>, 461 U.S. 238 (1983); <u>Meachum v. Fano</u>, 427 U.S. 215 (1976) (due process clause does not limit interprison transfer even when new institution is much more disagreeable); <u>Davis v. Kelly</u>, 160 F.3d 917, 920 (2d Cir. 1998).  Prisoners can be moved from institution to institution without any procedural formalities so long as the transfer does not amount to an "atypical, significant deprivation."  <u>Sandin v. Conner</u>, 515 U.S. 472, 486 (1995).  The situation is different, however, when an inmate contends that the defendant prison officials transferred him as a way of retaliating against him for his exercise of a constitutional right.

To establish a prima facie claim for retaliation under the First Amendment, plaintiff must prove that: 1) he was engaged in protected activity; 2) that the defendants took adverse action against him; and 3) that plaintiff's protected activity was a substantial or motivating factor for the adverse action. Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). However, it is a well-settled principle that an inmate's claim of retaliation must be handled with skepticism and cannot be maintained solely on conclusory terms. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 2003). The United States Court of Appeals for the Second Circuit held that this skepticism is required because,

> [f]irst, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official -- even those otherwise not rising to the level of a constitutional violation -- can be characterized as constitutionally proscribed retaliatory conduct.

Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds.*

Here, it is undisputed that plaintiff was engaged in protected activity. Filing a grievance or lawsuit constitutes protected activity under the First Amendment. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). This leaves the second and third prongs in dispute.

In prison cases, the test to determine whether adverse action has occurred is objective. The retaliatory conduct must be such "that [it] would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (quoting Davis v. Goord, 320 F.3d 346, 353, *superseded by* 320 F.3d 346 (2d Cir. 2003)). "This objective test applies even where a particular plaintiff was not himself subjectively deterred." Gill 389 F.3d at 381. See Davis, 320 F.3d at 353 (a prisoner "should not be denied remedy because his extraordinary efforts resulted in the resolution of grievances that would have deterred a similarly situated individual of ordinary firmness.")

Under the third prong, plaintiff must show that he has evidence from which a "a reasonable jury could find that the defendants' knowledge of his protected activity was a substantial or motivating factor in their decision to take an adverse action against him. Mt. Healthy Brd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). In order to satisfy this causation requirement, plaintiff's allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." Dawes, 239 F.3d at 492 (internal quotations and citations omitted).

Here, plaintiff does not assert that any of these defendants played a role in the decision to transfer him to Wallens Ridge Correctional Facility. Additionally, plaintiff does not produce any direct evidence (i.e. comments, statements, notes, letters)

indicating that he was being transferred because he engaged in protected activity. Instead, plaintiff relies exclusively on circumstantial evidence, that is, the timing of his transfer -- eighty-eight days after he filed his complaint.

While noting that direct evidence can be very difficult for a prisoner plaintiff to obtain, it is a well-established principle that a plaintiff does not meet his burden by "simply showing that the protected activity happened before the defendants took their action." Johnson v. Kingston, 292 F. Supp. 1146, 1154 (W.D. Wis. 2003) (citing Sitar v. Indiana Dept. of Transp., 344 F.3d 720, 728 (7th Cir. 2003)) (noting that one event's following closely upon another is not dispositive in proving that the first act caused the second). "The temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." Gayle v. Gonyea, 313 F.3d 677, 683 (2d Cir. 2002). However, proximity alone, while suspicious, is insufficient "to allow a reasonable jury to find that it was the reason for the defendants' decision." Johnson, 292 F. Supp. 2d at 1154. Plaintiff must reference other events which suggest a relationship between the protected activity and the retaliatory action. Id. See also Bennett, 343 F.3d at 138-39 (plaintiff's temporal proximity claim was supported by the fact that defendants actions were found to have been unjustified and were overturned); Morales v. Macalm, 278 F.3d 126, 131 (2d Cir. 2002) (short time between protected activity and retaliation coupled

with defendants involvement in the decision to transfer was sufficient to support inference of retaliatory motive); <u>Wells v. McGinnis</u>, 344 F. Supp. 594, 596 (S.D.N.Y. 1972) (mere transfer, without more, did not constitute interference with counsel). At the summary judgment stage, plaintiff must provide more than his subjective belief that he was the subject of retaliation. <u>Vukadinovich v. Brd. of School Trustees of North Newton School Corp.</u>, 278 F.3d 693, 700 (7th Cir. 2002) (citing <u>Johnson v. University of Wisconsin-Eau Claire</u>, 70 F.3d 469, 480 (7th Cir. 1995)).

Defendants assert that the decision to transfer plaintiff to Wallens Ridge had no relation to the fact that plaintiff exercised his right to seek medical treatment[6] or file a lawsuit. Defs'. Memo p. 29-30. In fact, defendants claim that they were not aware of plaintiff's lawsuit when he was transferred on November 9, 1999. Defs'. Reply Memo. p. 7, 19. Defendants allege, and the court docket confirms, that the United States Marshal was given plaintiff's complaint for service on December 13, 1999, and the complaint was served on December 23, 1999. Defendants state they were not aware of this lawsuit until the service of the complaint which occurred more than one month after plaintiff's transfer. Instead, Defendants claim that plaintiff was considered for transfer due to the overcrowding issues faced

---

[6] In fact, plaintiff sought and obtained medical treatment at the Virginia prison on at least 29 occasions. Defs'. Memo p. 29.

by the Connecticut Department of Corrections.  Id.  Defendants
argue that plaintiff was medically stable and was classified
according to his risk to safety and security.  Id.  In accordance
with Meachum, 427 U.S. at 225, defendants claim that prison
officials can transfer a prisoner for "any constitutionally
permissible reason or for no reason at all."  They concede that
the reason cannot be retaliation for engaging in protected
activity.

At this stage, however, defendants do not have the burden of
showing that they were not motivated by a desire to retaliate
against plaintiff when he was transferred to Wallens Ridge.  It
is up to the plaintiff to show that he could adduce sufficient
evidence at trial to allow a jury to find that defendants were
motivated by a desire to retaliate against him.  In an effort to
meet his prima facie burden, plaintiff relies exclusively on the
timing of his transfer as evidence that his transfer was
motivated by the filing of his complaint.  The Court finds that
this allegation alone is insufficient for a jury to find
retaliation by defendants.  Prison officials are free to transfer
inmates as needed, as long as their reasons for doing so are not
retaliatory.  Sandin, 515 U.S. at 486.  While all reasonable
inferences must be drawn for the non-moving party on summary
judgment, "it is not enough for plaintiff to state his subjective
belief that he was the subject of retaliation." Vukadinovich,
278 F.3d at 700 (internal citations omitted).  Plaintiff has only
offered his own assertion that his transfer must have been

retaliatory based on the fact that it occurred eighty-eight days after he filed this lawsuit. However, plaintiff was transferred in November of 1999, a month before his complaint was served on the defendants. There is no evidence that defendants were aware of the lawsuit until they were served. Based on the above, the Court finds that plaintiff has not produced sufficient evidence to withstand summary judgment.

## IV.   Conclusion

For all of the above reasons, defendants' motion for summary judgment [Doc. #94] is **granted.** This is not a recommended ruling. The parties have consented to proceed before a United States Magistrate Judge [Doc. #75] and, on December 3, 2004, the case was transferred to the undersigned for all purposes including the entry of judgment.

The Clerk is ordered to enter Judgment for the defendants and close the case.


**SO ORDERED** at Bridgeport this 2nd day of March, 2007.



_____/s/_____
_____**HOLLY B. FITZSIMMONS**
**UNITED STATES MAGISTRATE JUDGE**